IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NUMBER 22-13606-CC


UNITED STATES OF AMERICA,

Appellee,


v.


JIMIKA IVORY WILLIAMS,

Appellant.


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

_____


BRIEF OF APPELLANT
JIMIKA IVORY WILLIAMS
_____

MANUEL GONZALEZ, JR., ESQ.
Florida Bar No.  397997
Attorney for Appellant
121 Alhambra Plaza
Suite 1500
Coral Gables, FL  33134
(305) 444-1400
(305) 938-5009 (FAX)
Mannylaw7@yahoo.com (email)

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, counsel for the Appellant Jimika Ivory Williams certifies that the following persons and entities may have an interest in the outcome of this case:

AESC/Paramount Charter School

Broward County School Board

Marx Calderon

Michael Caruso

Ariana Fajardo-Orshan, United States Attorney

Florida Scholar Education Corp.

Juan Antonio Gonzalez, United States Attorney

Manuel Gonzalez, Jr.

Magistrate Judge Patrick M. Hunt

Huda Ajlani Macri

Eric E. Morales

Thomas J. Mulvihill

Lisa Tobin Rubio

The Honorable Rodney Smith, United States District Judge

Magistrate Judge Lurana S. Snow

Sun Trust Bank acquired Truist Financial Corporation (TFC)

United States Department of Education (DOE)

Magistrate Judge Alicia O. Valle

Wells Fargo Bank (WFC)

Darryl Elliott Wilcox

Jimika Ivory Williams

Cynthia R. Wood

William T. Zloch

United States Attorney Markenzy Lapointe

## STATEMENT REGARDING ORAL ARGUMENT

Appellant WILLIAMS respectfully requests oral argument and suggests the same is necessary in order to permit a full and adequate review of all issues in this brief.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT …………………………i

TABLE OF CONTENTS …………………………………………….......ii

TABLE OF CITATIONS …………………………………………………..iv

STATEMENT OF JURISDICTION ……………………………………….1

STATEMENT OF THE ISSUES ………………………………………..1

STATEMENT OF THE CASE ………………………………………….2

    (I).    COURSE OF PROCEEDINGS AND DISPOSITION
           BELOW……………………………………………………….…2

    (II).    STATEMENT OF THE FACTS ……………………………………4

    (III).  STATEMENT OF STANDARD OF REVIEW ..………………......14

SUMMARY OF THE ARGUMENT ……………………………………...17

Arguments:

    I.    THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN MS.
        WILLIAMS'S CONVICTIONS ON COUNTS 1-20.. . . . . . . . 20

    II.    THERE WAS A MATERIAL VARIANCE AND/OR A
        CONSTRUCTIVE AMENDMENT IN VIOLATION OF THE FIFTH
        AMENDMENT…….…………….……………….………………37

    III.    THE DISTRICT COURT ERRED IN NOT GRANTING A NEW
         TRIAL BASED ON THE BRADY VIOLATION………………44

IV.     THE DISTRICT COURT ERRED IN DENYING DEFENDANT'S
        JURY INSTRUCTIONS AND NOT ADDRESSING THE JURY
        CONFUSION ……………………………………………………….47

V.      DEFENDANT'S RIGHTS WERE SUBSTANTIALLY
        PREJUDICED BY PROSECUTORIAL MISCONDUCT………..54

VI.     THE DISTRICT COURT ERRED IN ORDERING RESTITUTION

        ……………………………………………………………......56

CONCLUSION ……………………………………………………………57

CERTIFICATE REGARDING TYPE, SIZE AND STYLE AND COMPLIANCE
WITH WORD COUNT LIMITATIONS ……………………………………….58

CERTIFICATE OF SERVICE ………………………………………….…58

# TABLE OF CITATIONS

CASES                                                                                                    PAGES

*Berger v. United States*, 295 295 U.S. 78, 83, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935)……………………………………………………………38, 39

*Brady v. Maryland,* 373 U.S. 83 (1963)……………………………….…………..44

*Carpenter v. United States*, 484 U.S. 19, 25 (1987)…………………...……….27

*Cleveland v. United States*, 531 U.S. 12, 15, 121 S. Ct. 365, 369, 148 L. Ed. 2d 221 (2000)……………………………………………………………………..…..37

*Giglio v. United States,* 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972)…..44

*Kelly v. United States*, 140 S. Ct. 1565, 1573, (2020)…………………………….34

*Kotteakos v. United States*, 328 U.S. 750, 774, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946)……………………………………………………………………..38

*Kyles v Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)………44

*McNally v. United States*, 483 U.S. 350, 360 (1987)……………………..……..56

*Russell v. United States*, 369 US 749 769 (1962)………………………………..43

*Shaw v. United States,* 137 S.Ct. 462, 469 (2016)………………..…....……..30, 47, 48

*Stirone v. United States*, 361 U.S. 212, 212-19, 80 S.Ct. 270, 273-74, 4 L.Ed. 2d 252 (1960)……………………………………………………………………38

*United States v. Bagley,* 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)……………………………………………………………………..44

*Atlanta Journal & Const. v. City of Atlanta Dep't of Aviation*, 442 F.3d 1283 (11th Cir. 2006)……………………………………………………..…………..17

*Belt v. United States*, 868 F.3d 1208, 1211 (11th Cir. 1989)……………………..37

*Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994)……………………………………..55

*Hays v. Alabama,* 85 F.3d 1492 (11th Cir. 1996)………….…………….……….15

*Howard v. Daggett*, 526 F. 2d 1388 (9th Cir. 1975)……………………...……40

*Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000)………...36

*United States v. Abu-Shawish*, 507 F.3d 550 (7th Cir. 2007)……………..…….21

*United States v. Adams*, 74 F.3d 1093 (11th Cir. 1996)…..……………….…...17

*United States v. Altomare*, 673 F. App'x 956 (11th Cir. 2016)…………….….37

*United States v. Anguiano*, 873 F.2d 1314, 1319-20 (9th Cir. 1989)……………...50

*United States v. Arias*, 984 F.2d 1139 (11th Cir 1993)……………………….49, 53

*United States v. Bailey*, 123 F.3 1381 (11th Cir. 1997)…………………...……56

*United States v. Beasley*, 72 F.3d 1518 (11th Cir. 1996)..…………………………15

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015)……………..…..25, 26

*United States v. Cancelliere*, 69 F.3d 1116, 1121 (11th Cir. 1995)……………41

*United States v. Church*, 955 F.2d 688 (11th Cir. 1992)…………………….…39

*United States v. Cooper*, 132 F.3d 1400, 1405 (11th Cir. 1998)…………..……...36

*United States v. Cooper*, 203 F. 3d 1279 (11th Cir. 2000)…………….....…………14

*United States v. Cruzado-Laureano*, 404 F.3d 470, 483-84 (1st Cir. 2005)………22

*United States v. Daniel*, 329 F.3d 480 (6th Cir. 2003)…………………..……...30

*United States v. Dean*, 487 F.3d 840, 847 (11th Cir. 2007)……..…………...…16

*United States v. DeSantis*, 134 F. 3d 760, 764 (6th Cir. 1998)……………………30

*United States v. Delgado*, 56 F.3d 1357 (11th Cir. 1995)………..…..…......16, 17

*United States v. Dennis*, 237 F.3d 1295, 1300 (11th Cir. 2001)………………..…15

*United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011)……………..……….14

*United States v. Echeverry,* 719, F.2d 974, 975 (9th Cir. 1983)………...….…..49, 50

*United States v. Eckhardt*, 466 F. 3d 938, 947 (11th Cir. 2006)…………….…..17

*United States v. Ellington*, 348 F.3d 1984 (11th Cir. 2003)…………………….14

*United States v. Flynt*, 15 F.3d 1002 (11th Cir. 1994)………………..……….…..39

*United States v. Frank,* 599 F.3d 1221, 1237 (11th Cir. 2010)……………………16

*United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013)………………,…15

*United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999)……………………….55

*United States v. Hernandez*, 433 F. 3d 1328, 1332 (11th Cir. 2005)……….…..14

*United States v. Hope*, 901 F.2d 1013 (11th Cir. 1990)………………………….23

*United States v. House*, 684 F.3d 1173, 1996……………………………………14

*United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013)………………….…..38

*United States v. Jimenez,* 705 F.3d 1305, 1310-11 (11th Cir. 2013)………26, 45, 47

*United States v. Jones*, 32 F.3d 1512 (11th Cir. 1994)……………………….14

*United States v. Joseph*, 709 Fed.3d 1082 (11th Cir. 2013)……………...……14,16

*United States v. Karie*, 976 F.3d 800, 2020 U.S. App. LEXIS 31046 (8th Cir. 2020)……………………………………………………………………...…….57

*United States v. Keller*, 916 F.2d 628 (11th Cir. 1990)………………………39, 41

*United States v. Kottwitz*, 614 F.3d 1241 (11th Cir. 2010)………………………..16

*United States v. Lander*, 668 F.3d 1289 (11th Cir. 2012)……………………..……39

*United States v. Lanier*, 920 F.2d 887 (11th Cir. 1991)……………………..…….23

*United States v Leonard*, 138 F.3d 906, 910 (11th Cir. 1998)……………………53

*United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009)……………………16

*United States v. Lively,* 803 F. 2d 1124, 1126 (11th Cir. 1986)………………….…49

*United States v. Mann,* 172 F.3d 50 (6th Cir. 1999)……………….…...……..24, 25

*United States v. Martin*, 803 F.3d 581, 593-94 (11th Cir. 2015)……………...….43

*United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987)…………………………55

*United States v. Miller,* 953 F.3d 1095 (9th Cir. 2020)…………….….…………48

*United States v. Mills,* 140 F.3d 630, 634 (6th Cir. 1998)……………………..23, 24

*United States v. Morse*, 785 F.2d 771, 775 (9th Cir.), cert. denied, 476 U.S. 1186, 106 S.Ct. 2925, 91 L.Ed.2d 553 (1986)……………………………...…….38

*United States v. Naranjo*, 634 F.3d 1198, 1206 (11th Cir. 2011)…………………15

*United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004)……………….…..41

*United States v. Obregon*, 893 F.2d 1307 (11th Cir. 1990)…………………………16

*United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002)……………….....14

*United States v. Pierce*, 479 F.3d 546, 99 A.F.T.R.2d (RIA) 2007-1350, 2007 U.S. App. LEXIS 5437 (8th Cir. 2007)……………………………………………..57

*United States v. Regent Office Supply,* 421. F. 2d 1174 (2nd Cir. 1970)…….34, 36

*United States v. Richardson*, 233 F.3d 1285, 1292 (11th Cir. 2000)…………...…15

*United States v. Robertson*, 493 F.3d 1322. 1334 (11th Cir. 2007)…………….....43

*United States v. Ruiz*, 59 F. 3d 1151, 1154 (11th Cir. 1995)…………...………48, 49

*United States v. Schlei*, 122 F.3d 944 (11th Cir. 1997)………………………………15

*United States v. Schumaker*, 479 F. App'x 878 (11th Cir. 2012)…………………15

*United States v. Scrushy*, 721 F.3d 1288 (11th Cir. 2013)………………………15

*United States v. Silverman*, 402 U.S. 953 (1971)…………………………………...28

*United States v. Starr,* 816 F. 2d. 94 (2nd Cir. 1987)………………….……28, 31

*United States v. Stockton,* 788 F.2d 210 (4th Cir. 1986)………………………26, 31

*United States v. Svete*, 556 F.3d 1157, (11th Cir. 2009)…………………….....16, 37

*United States v. Takhalov,* 827 F.3d 1307, 1312-13 (11th Cir. 2016)…28, 30, 31, 46

*United States v. Tampas*, 493 F.3d 1291 (11th Cir. 2007)…………………………..41

*Unites States v. Thompson,* 484 F.3d 877, 881 (7th Cir. 2007)……………………26

*United States v. Tokars*, 95 F.3d 1520 (11th Cir. 1996)…………………………...16

*United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir. 1989)………………...…53

*United States v. Ward*, 486 F.3d 1212, 1227 (11th Cir. 2007)……………………41

*United States v. Weissman*, 899 F.2d 1111, 1114 (11th Cir. 1990)……………….39

*United States v. Whacker*, 72 F.3d 1453 1474 (10th Cir. 1995)…………………43

*United States v. Williams*, 30 F.3d 1319 (11th Cir. 2004)………………………..14

*Unites States v. Wilson*, 149 F.3d 1298 (11th Cir. 1998)…………………………55

## STATUTES

18 U.S.C. Section 666(a)(1)(A)……………………………………………...passim

18 U.S.C. Section 1341 …………………………..…………………………passim

18 U.S.C. Section 1343 ………………………………………………...passim

18 U.S.C. Section 3742 …………………………………………………………1

28 U.S.C. Section 1291 …………………………………………………………1

## OTHER AUTHORITIES

Eleventh Circuit Rule 28-1 …………………………………………………58

Eleventh Circuit Rule 28-2 …………………………………………………58

Rule 4, F.R.App.P …………………………………………………………1

Rule 28, F.R.App.P ………………………………………………….…...58

Rule 32, F.R.App.P ………………………………………..…………..58

F.S. Section 112.313(12)……………………………………………......34

F.S. Section 1002.33…………………………………………………42

## STATEMENT OF JURISDICTION

This Court has jurisdiction to entertain this appeal pursuant to Rule 4,

Federal Rules of Appellate Procedure, Title 28, United States Code, Section 1291,

and Title 18 U.S.C. Section 3742. This is a direct criminal appeal. The district

court had original jurisdiction pursuant to 18 U.S.C. Section 3231.

## STATEMENT OF THE ISSUES

I.     WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN MS. WILLIAMS'S CONVICTIONS ON COUNTS 1-20?

II.     WHETHER THERE WAS A MATERIAL VARIANCE AND/OR A CONSTRUCTIVE AMENDMENT IN VIOLATION OF THE FIFTH AMENDMENT?

III.     WHETHER THE DISTRICT COURT ERRED IN NOT GRANTING A NEW TRIAL BASED ON THE BRADY VIOLATION?

IV.     WHETHER THE DISTRICT COURT ERRED IN DENYING DEFENDANT'S JURY INSTRUCTIONS AND NOT THE JURY CONFUSION?

V.     WHETHER DEFENDANT'S RIGHTS WERE SUBSTANTIALLY PREJUDICED BY PROSECUTORIAL MISCONDUCT?

VI.     WHETHER THE DISTRICT COURT ERRED IN ORDERING RESTITUTION?

## STATEMENT OF THE CASE

**I.**      COURSE OF THE PROCEEDINGS AND DISPOSITION BELOW.

On November 19, 2020, the Grand Jury returned a twenty (20) count Indictment against Ms. Williams. She was charged in Counts 1 and 2 with theft concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A). [DE: 1] Counts 3-20 were for wire fraud in violation of 18 U.S.C. § 1343.

On March 14, 2022, this case proceeded to jury trial. [DE: 73] On March 23, 2022, the jury returned a verdict of guilty as to Counts 1 through 20. [DE: 90]

On April 25, 2022, the Court entered a paperless order granting the Motion for Termination of Appointment of FPD and appointed the undersigned counsel. [DE 113]

Thereafter, the district court then granted Ms. Williams and her post-trial counsel, several extensions of time to file post-trial motions. [DE:113,118,122,131,140,145,148] On May 4, 2022 a Presentence Investigation Report was filed by the U.S. Probation Office. (DE 114). On June 16, 2022, the Government filed Objections to Pre-Sentence Report. [DE 132] On August 23, 2022, Appellant filed Objections to Presentence Investigation Report and Memorandum of Law. (DE: 146)

On September 12, 2022, Appellant filed a Motion for New Trial [DE 149] and a Motion for Judgment of Acquittal Notwithstanding the Verdict [DE 150]. On October 3, 2022, the Government filed its Response in Opposition to the Motion for Judgment of Acquittal Notwithstanding the Verdict [DE 155]. On October 4, 2022 the Government filed its Response in Opposition to Appellant's Motion for New Trial [DE 156]. On October 11, 2022, Appellant filed a Motion for Extension of Time for its Reply and filed a Reply to the Government's Response to the Motion for New Trial. [DE 158,159] On October 12, 2022, the Court entered a paperless order granting the Motion for Extension of Time. [DE 160] On October 12, 2022, Appellant filed her Reply to the Government's Response to the Motion for Judgment of Acquittal Notwithstanding the Verdict. [DE 161]

On October 18, 2022, at the sentencing hearing, the Court ore tenus denied Appellant's Motion for New Trial and Motion for Judgment of Acquittal Notwithstanding the Verdict [DE 165,166]* The district court sentenced Ms. Williams to a term of imprisonment of forty(40) months as to Counts 1 through 20, all such terms to run concurrently. Upon release from imprisonment, Ms. WILLIAMS shall be on supervised release for a term of 3 years. No fine was imposed and $2,000.00 was assessed. [DE 166]. A restitution hearing was set for January 6, 2023. [DE 167]

On October 25, 2022, Appellant filed a Motion for Release from Custody Pending Appeal. [DE 168] On October 27, 2022, Ms. WILLIAMS filed a timely Notice of Appeal. [DE 169] On November 7, 2022, the Government filed its Response to the Motion for Bond Pending Appeal. [DE 172] On November 15, 2022, Ms. WILLIAMS filed a Reply to the Government's Repsonse to the Motion for Bond Pending Appeal. [DE 173] On December 6, 2022, the Court entered a paperless order denying the Motion for Release from Custody Pending Appeal. [DE 176] Appellant is incarcerated at Alderson FPC pending this appeal.

On January 6 and 13, 2023, a restitution hearing was held. [DE179,182,188, 191] The district court ordered restitution in the amount of $552,131.00. [DE 182] On January 19, 2023, an Amended Judgment was entered to include restitution. [DE 183]

*On February 14, 2023, the district court entered a Paperless Order denying the Motion for Judgment of Acquittal Notwithstanding the Verdict [DE 150] and the Motion for New Trial [DE 149] for the reasons stated in open court on 10/18/2022. [DE 184, 190-9-11]

## II.  <u>STATEMENT OF THE FACTS</u>

On October 24, 2013, The Advancement of Education in Scholars

Corporation (AESC) was registered as a non-profit corporation with the Division of Corporations for the Florida Department of State. [DE: 114-4, par. 7]

AESC maintained bank accounts with SunTrust Bank (ending in 8712, 8279, and 8257), for which Williams was a signatory. [DE: 114-5, par. 8]

On February 13, 2015, Ms. Williams, as President of AESC, signed a charter agreement with the School Board of Broward County (SBBC) in Fort Lauderdale, Florida. In this agreement, AESC agreed to operate a charter school for which the School Board was to provide funding. [DE: 114-5, par. 9]

The charter required AESC to provide specific and detailed financial records, including monthly and quarterly reports, and to provide copies of bank statements and canceled checks, if requested by the School Board of Broward County. [DE: 114-5, par. 10]

The charter specified that members of AESC's Governing Board could not be employees of the school, and that members "shall not receive financial benefit from the school's operation including, without limitations, the receipt of any grant funds." It required the Governing Board Chairman to file annual statements stating among other provisions that: (1) no member of the governing board acting in a private capacity had sold services, directly or indirectly to the schools; (2) no

member of the governing board was an employee of the school; and (3) no member of the governing board had received compensation, directly or indirectly from the school's operations. [DE: 114-5, par. 11]

The provisions of the charter, in Section 9.K., "Compliance with Applicable Ethical Requirements" specifically states that a violation of the provision shall constitute a material breach and good cause for its termination. *See* Appendix for all charter provisions.

In furtherance of the agreement, AESC operated Paramount Charter School (Paramount) (PCS), which was a kindergarten through eighth grade charter school located in Sunrise, Florida, with an average enrollment of 200 students. Between July 21, 2015 and March 1, 2017, Broward County Public Schools paid $2,470,843 to accounts maintained by AESC for the operation of PCS. [DE: 114-5, par. 12] On October 28, 2015, Florida Scholars Educational Services Corporation (FSESC) was incorporated in the state of Florida. Ms. Williams was the President and the sole signatory on the corporation's bank account maintained with Wells Fargo Bank (account ending in 6947). [DE: 114-5, par. 13] Ms. Williams was a member of the governing board and provided administrative services for AESC and FSESC, who was a vendor for AESC. [DE: 114-6, par. 14 par. 15] On February 3, 2017, Ms. Williams resigned her position as a board member with AESC and PCS.

[DE: 114-7, par. 19] Mark Morley testified that American Charter Development (ACD) was the landlord for PCS, lender and financier. He confirmed that ACD did not provide any services such as food and transportation to PCS, but they hired a consultant to help with the start-up of the school. ACD invests in charter schools and charges rent to get back a return on their investment. Cheri Shannon could have done all the work for ACD and they paid her about $340,000. ACD had records to show how the funds are spent. ACD was not a part of the governing board of either AESC or PCS, was not an auditor, a management company, or part of the SBBC. [DE: 133-50] He testified that if they paid someone like Lori Manning, to operate the school, then ACD would still be out of the same amount of money besides the rent owed. [DE: 133-51, 52] The losses of the school were because of poor fiscal management and should have resulted in the firing of someone. [DE: 133-52] ACD had no authority to hire or fire anyone at either AESC or PCS.

Corey Montgomery, principal of PCS, testified that Ms. Williams was in his office for a majority of the days doing work and that she did a lot of the administrative chores related to the school. [DE: 133-97] Ms. Williams was there full time. [DE: 133-98] He testified Ms. Williams said she was a volunteer. [DE: 133-99] The charter was never mentioned to him. [DE: 133-100] He met Maia

Williams, Defendant's sister, and it was disclosed to him that she was there to help and keep the school successful. [DE: 133-100-101] He had absolutely no access to the bank accounts. [DE: 133-102] He got calls from several vendors saying they were behind on payments. [DE: 133-105-106] This was after Ms. Williams had resigned from the board and a civil action had been initiated by ACD. Maia was his assistant and helper at the school. [DE: 133-118] Defendant was doing a lot of administrative work which included finances. [DE: 133-133] She coordinated payroll and benefits for the staff. [DE: 133-133] She produced a curriculum that they worked on together. [DE: 133-133-134] She recruited children to come to the school through community outreach programs. [DE: 133-134-135] She got insurance for the school. [DE: 133-135-136] Most people would get paid to do the things that Ms. Williams was doing. [DE: 133-135-136]

Luwando Wright was employed with the SBBC. [DE: 141-3] With regards to the charter, she referenced portion(s) that detail the grounds for termination for good cause; or non-renewal and that there were various stipulations in order to terminate the agreement. [DE: 141-27] Terminating the contract means closing the school. [DE: 141-27, 56]  She referred to the portion of the agreement or charter that good cause shown will be a material breach or violation of the school standards. [DE: 141-29] A school's willful or reckless failure to manage public

funds is a ground for good cause termination. [DE: 141-29, 56] She confirmed that

nothing in the charter school contract says that this type of violation could lead to

criminal sanctions. [DE: 141-56] If you disclose a conflict of interest then you're

exempted from the requirements of subsection 3, the exemption of doing business

with your own agency. [DE: 141-59] She testified about the services and actions

that ESPs would do. Those included handling the operations on behalf of the

governing board, the operations of the school, hire the principal, recommend

principals to be hired, they may aid in hiring of staff, aid in assisting with

fundamental school operations such as transportation, communication with parents,

food services, all of these contracted services that need to be provided. [DE: 141-

60] ESPs order textbooks, make sure staff is properly trained, and handle

professional development of the staff. [DE: 141-60] ESPs are compensated. [DE:

141-60]

Reynaldo Tunnerman, auditor for BCSB, testified that PCS provided the

School Board a copy of PCS' Audit Report. The Report shows that Defendant was

the Board President and Acting Administrator. It listed her as Jimika Mason. It

showed the revenue received, approved expenditures, and financials of PCS. [DE:

133-144-145] Mason was Defendant's married name. She subsequently was

divorced and adopted her maiden name of Williams. This Report showed that

BCSB was on notice that Defendant was Board President and Acting Administrator for PCS.

Marcia Carty was PCS' school's accountant, who was hired by Williams. [DE: 143-34] Williams brought Ms. Carty the general ledger containing all the checks, deposits, and financials about the school/business. [DE: 143-39, 42] The checks were for educational services, instructional services, and professional services. [DE: 143-45, 47]

Jody Perry worked with the BCSB for 35 years in different capacities which included director for charter schools. [DE: 133-65] A charter school is publicly funded but privately managed. [DE: 133-66] Charter school management companies work under a separate contract for the non-for-profit. The non-for-profit has the agreement with the district to not make money and run the school, then they pay management companies for daily operations. Not all charter schools choose to do that. [DE: 133-67] Ms. Perry stated that once funds go into a charter school's hands, the district has no authority. [DE: 133-68] She was the director of charter schools and had to be aware of all charter schools in the district. She became aware about PCS because the office received complaints which included nonpayment. [DE: 133-68] Mr. Wilcox asked Ms. Perry if she remembered telling Defendant she could not be paid or she could not receive compensation while she

was on the board and she replied that she did not remember. [DE: 133-69-70] It is allowable for a former board member to be hired by a charter school under specific criteria that includes that they are a separate vendor and do not involve themselves with the finances of the school. [DE: 133-70-71] The district does not have the authority to make the schools do what they are supposed to do. She referred to the charter school contract, conflict of interest provision, and that it is associated with the sunshine law. [DE: 133-78]

Donte Collins, Director of the Charter Schools Management Support Department for Broward County Public Schools, testified that no provision in the charter says that board members cannot resign and then work for the educational services provider for the school. [DE: 143-125-133-134] Charter schools commonly close because of financial issues/mismanagement. [DE: 143-135-136] Charter schools are public schools that operate under a charter which exempt them from many of the rules and regulations that govern traditional public schools. [DE: 143-125] Once the school board deposits the funds into the account for the school, the BCSB has no say on how the school spends or allocates that money. [DE: 143-127] Once the funds are deposited into the charter account, the charter school has full authority to spend that money as they wish. [DE: 143-128] BCSB cannot tell charter schools how to spend their money. [DE: 143-128] Education Services

Provider (ESP), is an individual or an organization that a nonprofit entity or private or public entity would enter into an agreement with to provide services that are needed for a school or governing board. [DE: 143-130] Once the charter is approved, the board or the nonprofit has to locate space for the students, market for the school, hire staff, amongst other things. [DE: 143-131] She testified that usually the charter or nonprofit has someone that does marketing for them. [DE: 143-133]

Ms. Williams testified that she opened the school to close the achievement gap between low-income minority students and their peers. [DE: 143-147,148]

She testified about the many duties and actions she took along with Ms. Shannon so far as recruitment, curriculum, and the start-up budget. [DE: 143-150-151] She had a contract with the school to provide administrative duties and believes she did not violate the charter. [DE: 143-155] She referenced statutes listed in the charter which had exemptions that applied to her. [DE: 143-155-156] She testified about the PCS Charter School Conflict of Interest Disclosure Form from a board meeting held at the end of October, 2013, which includes receiving compensation for administrative duties. [DE: 143-159,160] Her interpretation and belief of the laws and statutes, was that she could have a quorum of herself solely being 1/3 of the board members. [DE: 143-162-164] She was compensated from

the contract and agreement for $240,000 a year and compensated for the previous years that she had worked for the start-up of the school. She had not received any income for the five to six years to get the school open. [DE: 143-165-166] She did not believe this was a conflict of interest; and her belief/understanding of the law was if the contract was fair, it was not a conflict of interest. [DE: 143-166] She did accounting, budgeting, human resources, recruitment, food services, curriculum instruction, and data interpretation. [DE: 143-169] She did not steal from PCS and worked 7 days a week. [DE: 143-172] Counts 3 through 20 were her salary and if you add up the checks it would equal her salary. [DE: 143-173] She worked for 6 years without any pay and wanted the school to survive, be successful, and for students to go to college. She did not steal or intend to defraud PCS. [DE: 143-174] She told Mr. Montgomery she was a volunteer with regards to being a board member and not in relation to the contract for services rendered. [DE: 143-189-192] The school voluntarily closed. [DE: 143-199] Before she resigned the vendors were paid every single month and the accountant had the checks. [DE: 143-200]

**(III)**              **STATEMENT OF THE STANDARD OF REVIEW**

This court reviews the denial of a post-trial motion for Judgment of Acquittal de novo. *United States v. Williams*, 30 F.3d 1319 (11th Cir. 2004); *United States v. Ellington*, 348 F.3d 1984 (11th Cir. 2003); a manifest miscarriage of justice is the standard if Ms. Williams is precluded because she presented evidence. *United States v. House*, 684 F.3d 1173, 1996; *United States v. Jones*, 32 F.3d 1512 (11th Cir. 1994).

This Court reviews the sufficiency of the evidence de novo, viewing all reasonable references in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict. *United States v. Joseph*, 709 Fed.3d 1082 (11th Cir. 2013); *United States v. Hernandez*, 433 F. 3d 1328, 1332 (11th Cir. 2005); *United States v. Cooper*, 203 F. 3d 1279 (11th Cir. 2000); *See United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011).

The sufficiency of the indictment is a legal question that the court reviews de novo. *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002).

The plain-error standard of review for whether a material variance occurred is "twofold." First, the appellate court must determine whether a material variance did occur, and second, whether the defendant suffered substantial prejudice as a

result. *United States v. Schumaker*, 479 F. App'x 878 (11th Cir. 2012) citing *United States v. Dennis*, 237 F.3d 1295, 1300 (11th Cir. 2001).

A trial court's denial of a new trial motion is reviewed for abuse of discretion. A district court abuses its discretion when it misapplies the law in reaching its decision or bases its decision on findings of fact that are clearly erroneous. *United States v. Scrushy*, 721 F.3d 1288 (11th Cir. 2013).

The appellate court reviews a denial of a motion for a new trial based on an alleged violation of Brady for abuse of discretion. *United States v. Naranjo*, 634 F.3d 1198, 1206 (11th Cir. 2011). The district court's conclusion that no Brady violation occurred is subject to de novo review. *United States v. Schlei*, 122 F.3d 944 (11th Cir. 1997); *United States v. Beasley*, 72 F.3d 1518 (11th Cir. 1996). Whether a reasonable probability existed that the suppressed evidence would have changed the outcome is a mixed question of law and fact. *Hays v. Alabama*, 85 F.3d 1492 (11th Cir. 1996).

A challenge to a jury instruction presents a question of law subject to de novo review. *United States v. Gibson*, 708 F.3d 1256, 1275 (11th Cir. 2013); *United States v. Richardson*, 233 F.3d 1285, 1292 (11th Cir. 2000). This Court reviews the district court's refusal to give a requested jury instruction for abuse of

discretion. *United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013); *United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc).

A refusal to give a requested instruction will amount to an abuse of discretion if: (1) the instruction is correct; (2) the court did not address the substance of the instruction in its charge; and (3) the failure to give the instruction seriously impaired the defendant's ability to present an effective defense. *See United States v. Kottwitz*, 614 F.3d 1241 (11th Cir. 2010); *United States v. Dean*, 487 F.3d 840, 847 (11th Cir. 2007)

The court reviews a judge's response to a jury query during deliberations for an abuse of discretion. *United States v. Delgado*, 56 F.3d 1357 (11th Cir. 1995).

Prosecutorial misconduct is a basis for reversal only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantive rights of the accused. *United States v. Frank,* 599 F.3d 1221, 1237 (11th Cir. 2010); *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009); *United States v. Tokars*, 95 F.3d 1520 (11th Cir. 1996); *United States v. Obregon*, 893 F.2d 1307 (11th Cir. 1990). A defendant's substantial rights are prejudiced if there is a reasonable probability that, but for the improper remarks of the prosecutor, the outcome would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *United States v.*

*Adams*, 74 F.3d 1093 (11th Cir. 1996). The court reviews improper remarks by a prosecutor in context and assesses the probable jury impact. *United States v. Delgado*, 56 F.3d 1357 (11th Cir. 1995). This Court reviews de novo allegations of prosecutorial misconduct in closing argument because it presents a mixed question of law and fact. *United States v. Eckhardt*, 466 F. 3d 938, 947 (11th Cir. 2006).

Restitution is an equitable remedy. We review the district court's decision to grant or deny equitable relief for abuse of discretion, reviewing underlying questions of law de novo and findings of fact upon which the decision to grant equitable relief was made under the clearly erroneous standard. *Atlanta Journal & Const. v. City of Atlanta Dep't of Aviation*, 442 F.3d 1283 (11th Cir. 2006).

## SUMMARY OF THE ARGUMENT

There was insufficient evidence to convict Appellant, Ms. WILLIAMS, on Counts 1-20. The Indictment alleged that SBBC and the DOE were victims of embezzlement and wire fraud, by Ms. Williams, in violation of 16 U.S.C. § 666 (theft concerning programs receiving federal funds) and 18 U.S.C. § 1343 (wire fraud). The Indictment failed to allege that Ms. Williams embezzled the funds from PCS.

Ms. Williams was entitled to bona fide compensation for administrative services rendered. This salary exemption placed her out of the reach of the federal

statute (666(c)). Any alleged contravention of a state statute or regulation is not a crime. Further, Ms. Williams had a waiver of the conflict of interest. Ms. Williams was not a ghost worker.

There was insufficient evidence to prove that she defrauded SBBC or the DOE because there is clear evidence that she performed an abundance of work for the school which would have been compensated for. This goes to show that she had no intent to deceive, cheat, or defraud the school. Ms. Williams was an authorized vendor to PCS. Further, the funds were no longer under the ownership of SBBC as they were the school's money as testified to.

Ms. Williams was deprived of her right to be tried only on charges presented to the grand jury and indicted for. This was compromised and altered when the Government committed a variance and/or constructive amendment when they introduced evidence that American Charter Development, who was not listed in the Indictment, was a victim in this case. They shifted their entire prosecution to focus on ACD which should not have been allowed and the jury should not have been allowed to consider this in order to convict Ms. Williams. This substantially prejudiced Ms. Williams as ACD was not a part of the Indictment as a victim and she nor her counsel could not adequately prepare her defense for that at trial. This is why the case resulted in this manner.

The Government committed a Brady violation when they did not disclose evidence that they had which was the crux of Ms. Williams' defense. The May 24, 2017 letter, from Jody Perry to Ewana Anderson showed that SBBC had notice, knew that she had performed work, and that there was a waiver of conflict of interest. Ms. Williams and her counsel were deprived of using said letter during the direct testimony and cross-examination of said witnesses. Said letter exculpated Ms. Williams of the crimes charged.

The jury instructions requested by Ms. Williams should have been read to the jury for example, the honest wages exception wherein Ms. Williams did in fact believe she was being compensated for her work. Likewise, the instruction that if they find that there is a conflict of interest alone, that they should not convict Ms. Williams should have been given.

The district court erred when they did not cure the confusion that the jury had. The jury notes made it clear and obvious that the jury was confused, frustrated, and anxious to end the case. The court erred in not giving a specific unanimity instruction or a mistrial declared.

Then, during trial/closing arguments, the prosecution made prejudicial remarks in their argument that characterized Ms. Williams as an evil

creature/figure to which the jury was allowed to hear. These unnecessary comments resulted in Ms. Williams being prejudiced in the jury's view of her.

The restitution order was not appropriate because PCS was not victimized. Ms. Williams performed the administrative services and was a vendor of PCS through FSESC.

The district court abused its discretion when it ordered restitution to the alleged victims to whom the money did not belong to. Once the funds were disbursed to AESC and PCS the SBBC and the DOE had no legal authority to seek and/or to manage how the funds were expended. The only remedy was termination of the contract.

<u>**ARGUMENT**</u>

I.   <u>**THERE WAS INSUFFICIENT EVIDENCE TO SUSTAIN MS. WILLIAMS' CONVICTIONS ON COUNTS 1-20.**</u>

In order to violate 18 U.S.C. § 666 the defendant's embezzlement must affect the program that employs the defendant. Thus, it is not enough that the defendant commits embezzlement while employed by a covered organization. The embezzlement must be with the organization that the defendant is an agent of. The Indictment failed to allege that Ms. Williams embezzled from the organization from which she worked. At trial and in the Indictment, the Government alleged

that PCS received funding through SBBC and the contract prohibits her from being a governing board member and receiving financial benefits from PCS. Their contention is that she embezzled from SBBC because they did not give her authority to be compensated. The Government presented no proof that PCS did not authorize Ms. Williams to be compensated. The proof was she was exempted from the conflict of interest by the governing board of PCS. Luwando Wright, SBBC, testified that the charter contract prohibits a conflict of interest. [DE: 141-15] The Indictment failed to allege and there was no evidence that she embezzled from PCS. Ms. Williams is not an agent of SBBC. This makes the indictment and the government's proof fatally defective as to Counts 1 and 2. *United States v. Abu-Shawish*, 507 F.3d 550 (7th Cir. 2007) The court reasoned that it requires the property be owned by or under the care, custody, or control of such organization, government or agency. No one from PCS testified that Ms. Williams had no authority from PCS for FSESC to be compensated.

The statute contemplates where an insider in an organization (PCS) that receives federal funding has siphoned away funds without authority from this organization. The statute only mentions one organization, which implies that all three relevant attributes attach to the organization: it has custody of the funds, its agent committed the embezzlement without the authority from the organization,

and it is victimized by the embezzlement. There is no mention of a second organization that was victimized by embezzlement. The Government contended that between July 2015 and June 2017, Defendant used her position as president of AESC to embezzle a total of $389,857, which SBBC had wired into the Suntrust account for the operation of PCS. The Indictment named SBBC as the victim of the embezzlement because they wired state funds to PCS, although only about 80,000 of the wired funds were federal.

The statute requires that defendant be an agent of the organization that is victimized and be an agent of whom they embezzled from. In *United States v. Cruzado-Laureano*, 404 F.3d 470, 483-84 (1st Cir. 2005), the government had to prove three elements beyond a reasonable doubt (i) that Cruzado was an agent of an organization, or of a state, local, or Indian tribal government, or any agency thereof; (ii) that Cruzado embezzled, stole, and obtained by fraud or converted or intentionally misapplied property valued at 5,000 or more from such organizations, government, or agency and; (iii) that such organizations, or agency receives in any one year period federal funds in excess of 10,000. What is required is that the defendant was an agent of the federally funded organization and that the defendant obtained money from that organization by embezzlement.

In *United States v. Lanier*, 920 F.2d 887 (11th Cir. 1991), defendant's intent to repay the money was not a defense if the money was the property of the United States when it was taken. *Lanier* differs from this case because the money was no longer the United States' property as it was a grant given to SBBC and eventually the school. Donte Collins and Jody Perry testified that once the funds/money are given to the charter school, it is now private with no further discretion or decision-making by the government. Perry also testified that once the money is in the charter's bank account they have full authority to spend the money as they wish and SBBC has no authority. [DE: 133: 68] In accordance, PCS and Ms. Williams believed the money to be PCS and theirs to allocate in running the school. It was not the government's money anymore. *See United States v. Hope*, 901 F.2d 1013 (11th Cir. 1990), when an outright grant which is paid over to the end recipient (PCS) is utilized, commingled or otherwise loses its identity, the money in the grant ceases to be federal.

Courts have dismissed program fraud counts where the allegations fit within the statutory exemption in § 666 (c) because the money or property at issue constitutes bona fide compensation. *See United States v. Mills,* 140 F.3d 630, 634 (6th Cir. 1998) "affirming dismissal of § 666 counts and indictment where allegations met 666 (c) salary exemption because Congress" saw fit to exclude

from the reach of the federal statute those individuals and those transactions that involve only the payment of bona fide salaries, wages, fees, and other compensation." *United States v. Mann,* 172 F.3d 50 (6th Cir. 1999) Salary payments received by a defendant are bona fide if the defendant performs their job. In *Mills*, the court clarified that the exemption for bona fide salaries, wages, fees, and other compensation applies to salary payments that are received by a defendant. The court further held that the value of the yearly salary of a defendant if bona fide should not be considered in establishing the $5,000 element in the program fraud statute. Turning to the question of whether the salary alleged in the indictment was bona fide the court concluded that the salaries to be paid to defendants for actual performance of necessary duties constituted bona fide salary. *Id.* In *Mann*, the government sought to skirt this requirement by arguing that the illegal nature of the employment procurement process tainted the salaries and placed them outside the 666 (c) exemption, but the court disagreed. The government failed to allege that the jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment. Absent such allegations the court explained the government has no support for its claim that the salary paid to the defendant were not properly earned in the usual course of business. Our jury was

completely confused about this issue as evidenced by the Jury Notes. *See* [DE: 92 & DE: 93] and Argument IV below.

Other courts have followed this well-reasoned approach. *See United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) (Section 666 (c)) Provides the section as a whole does not apply to bona fide salary, wages, fees, or other compensation paid or expenses paid or reimbursed in the usual course of business. Compensation for a job by someone other than a ghost worker is a bona fide salary, bona fide employment also applies no matter who gets the job. *Id. at Mann.* "Upholding dismissal of indictment because as alleged the defendant's performance of duty as a principal in contravention of state regulations is not a federal crime under 666. Reasoning that though the defendant lacks appropriate credentials under state law because he legitimately performed a function of the necessary position of principal, his wages were bona fide. In our case, Ms. Williams by no stretch of the imagination was a "ghost worker."

These cases foreclose the programs fraud counts here where the Indictment failed to allege that Ms. Williams' compensation was not bona fide and in the usual course of business, or that she did not actually perform the required duties for Counts 1 and 2. The Indictment does not allege that Ms. Williams position was unnecessary and a sham, such as a fraudulently procured no show job wherein Ms.

Williams was a ghost worker. *See Blagojevich.* FSESC was a contracted vendor of PCS and Ms. Williams executed administrative tasks for her compensation. FSESC was an entity that Ms. Williams worked for. Testimonies of Agent Hesseberger, Reynaldo Tunnerman, and Corey Montgomery addresses that. [DE: 143-17-25, 30, 31; DE: 133-164; DE: 133-132, 133-136] The bona fide exemption applies herein.

Evidence of an undisclosed conflict of interest is insufficient, standing alone, to sustain a conviction for "intentionally misapplying" funds within the meaning of § 666, *United States v. Jimenez,* 705 F.3d 1305, 1310-11 (11th Cir. 2013). Public employees often implement rules with which they disagree, and they are tempted to bend these rules to achieve what they deem better outcomes. As long as the state gets what it contracts for, at the market price, no funds have been misapplied. *Unites States v. Thompson,* 484 F.3d 877, 881 (7th Cir. 2007). Ms. Williams provided services to the school and the school paid for those services.

The central element of conversion of property that lies in embezzlement must be without the permission of the owner and contrary to the wishes of the owner. *See United States v. Stockton,* 788 F.2d 210 (4th Cir. 1986) The owner of the funds in PCS's Suntrust bank account is PCS. An appropriation or expenditure of PCS funds is therefore unauthorized if it is done without permission of PCS. Therefore, the conflict of interest prohibition cannot solely be grounds of Ms.

Williams embezzling funds from PCS's Suntrust bank account. Theft cannot occur where PCS expressly permitted Defendant and FSESC to be compensated. Evidence proved that Ms. Williams executed duties in the usual course of business that were required and necessary for the school's function.

### WIRE FRAUD – COUNTS 3 – 20.

In *Carpenter v. United States*, 484 U.S. 19, 25 (1987), the court stated that §1341 protects property rights only. Carpenter upheld convictions under §1341 and the federal wire fraud statute, 18 U.S.C. § 1343 of defendants who had defrauded the Wall Street Journal of confidential business information. Citing decisions of this Court as well as a corporate law treatise, we observed that "[c]onfidential business information has long been recognized as property." 484 U.S., at 26. The following year, Congress amended the law specifically to cover one of the "intangible rights" that lower courts had protected under §1341: "the intangible right of honest services." Anti-Drug Abuse Act of 1988, §7603(a), 18 U.S.C. § 1346. Significantly, Congress covered only the intangible right of honest services even though federal courts had dismissed, for want of monetary loss to any victim, prosecutions under §1341 for diverse forms of public corruption, including licensing fraud.

There was no evidence of tangible injury shown during trial from which the jury could infer an intent to defraud PCS. *United States* v. *Silverman*, 402 U.S. 953 (1971). No governing board member testified that PCS was defrauded (cheated and deceived) by Ms. Williams, or that Ms. Williams or FSESC was not authorized or permitted by PCS to be compensated for the work Defendant did for PCS.

The Eleventh Circuit makes clear that a defendant "schemes to defraud" only if they scheme to deprive someone of something of value by trick, deceit, chicane, or overreaching. *United States v. Takhalov,* 827 F.3d 1307, 1312-13 (11th Cir. 2016). However, if a defendant does not intend to harm the victim "to obtain, by deceptive means, something to which the defendant is not entitled- then the defendant has not intended to defraud the victim. *Id.* at 1313.

To the extent that Ms. Williams may have violated an ethical duty to be more transparent with the school, that violation is at worst, an intent to deceive the school that she was the entity providing the services. However, as *Takhalov* makes clear, an intent to deceive is not an intent to defraud. The school got what it paid for the services provided by Ms. Williams. Therefore, the Government did not satisfy its burden that Defendant intended to defraud the school or the SBBC.

In *United States v. Starr,* 816 F. 2d. 94 (2nd Cir. 1987), the court reversed and dismissed the indictment because evidence was insufficient to sustain that the

defendants intended to defraud their letter shop customers. The defendants were indicted for defrauding the wrong party. It was established that the defendants provided services to the customers for exactly what they paid for. The evidence was that they defrauded the Postal Service and thus were the only one that could actually legally claim anything because they were the intended victims by the defendants. Similarly, in our case, Ms. Williams was indicted for defrauding SBBC and then the Government shifted it to defrauding ACD.

As testified to, once the funds have been given to the charter school, the government or district has no say or control of those funds no longer. Those funds are a grant and not a loan so once the grant is given there is no more connection to the government because the funds have become private.

Here, there cannot an intent to defraud because the intended use of the funds was for the vendors of the school, to aide the school in the regular course of business, and to compensate Ms. Williams for services rendered. The rent owed to ACD is not evidence of an intent to defraud. ACD was not the victim in this case.

Ms. Williams was exempted from the conflict of interest by the governing board of PCS for doing business with her own company. There was no tangible loss or injury of money or property to PCS because PCS received exactly what

they bargained for. *Id. at Takhalov.* The evidence was insufficient to support convictions for wire fraud and programs theft.

In order to be guilty of wire fraud the defendant must act with the intent not only to make false statements or utilize other forms of deception but also to deprive a victim of money or property by means of those deceptions. *See Shaw v. United States,* 580 US 63, 137 S. Ct. 462, 467 (2016) Being deprived of honesty is not tangible "property" and causes no harm (deprivation of money or property). *United States v. Daniel,* 329 F.3d 480 (6th Cir. 2003).

In *United States v. DeSantis, 134 F. 3d 760, 764 (6th Cir. 1998),* the court held that to convict a defendant of wire fraud the government must prove specific intent which means not only that a defendant knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or money, or undertake some action that he would not otherwise do absent the misrepresentation or omission.

There was no evidence that Ms. Williams did not fulfill the PEO contract or that she lied about the price of her contracted compensation to PCS. PCS "got what it bargained for," as outlined in the contract. Even if the checks were believed to deceive others, misrepresentations which only amounts to deceit are insufficient to

maintain a mail or wire fraud prosecution. *See Takhalov* and *United States v. Stockton,* 788 F.2d 210 (4th Cir. 1986). Instead, the deceit must be coupled with the contemplated harm to the victim that affects the very nature of the bargain itself. *See Starr* above. Such harm is apparent where a discrepancy between benefits reasonably anticipated because of the misleading representation and the actual benefits in which the defendant delivered or intended to deliver. *Id.* at *Takhalov*. Whether Ms. Williams may have deceived ACD fails to prove that she intended to defraud PCS. Various witnesses testified to Ms. William's work. In the Government's opening statement, it acknowledged Ms. Williams presence at PCS for the day-to-day operations. [DE: 136-3]

The Government's theory that ACD's loan money was comingled with funds held in PCS's bank accounts is factually inaccurate. Funds in which the government asserted were used to compensate Ms. Williams. [DE: 138-18-22].

The Indictment includes funds solely from PCS's Suntrust Bank account to FSESC's Wells Fargo bank account. The funds in which the Government alleges ACD loaned money to the school were deposited in a BB&T bank account, a different bank account. [DE: 133-41] This was contrary to what the Indictment charged and what was argued at the charge conference. The testimonies of Morely and Timmons evidenced that none of the funds provided by the company were ever

deposited or comingled with any funds in the PCS Suntrust bank account. [DE: 134-55-56] This was a separate bank and had nothing to do with the checks in the Indictment (Counts 3-20). These funds were not intertwined with the alleged funds from SBBC and DOE. In closing argument, the government erroneously asserted that ACD and PCS were one in the same when this is not so. The testimony of Morley affirmed that he is solely a financier, lender, and landlord not associated with PCS besides those terms, and that there were no comingling or intertwining of funds. He said that ACD was not an auditor for PCS nor was it a management company.

For PCS to be defrauded, Ms. Williams would have had to deceive and cheat PCS. The Government asserted that she defrauded the ACD, the wrong party. The evidence did not support a finding that she intended to defraud PCS. Any misrepresentation by Ms. Williams did not pertain to the bargain of FSESC and PCS. Misrepresentations amounting only to deceit are insufficient to maintain a mail or wire fraud prosecution. The deceit must be coupled with a harm (loss of money or property to the victim. SA Timmons testified that she could not say if the funds given to FSESC were legitimate or surmise as to what their purpose was for. She could only show that the funds left PCS Suntrust bank account and went to FSESC bank account. [DE; 134-99-100]

Ms. Williams writing checks to FSESC from PCS bank account was not done to execute any scheme. The government did not prove that there was a scheme to write checks to her company to hide her being paid for services not performed. Evidence at trial showed a disclosure for Ms. Williams to be compensated by PCS as a vendor was on file. Ms. Williams was listed as the president of FSESC with the secretary of state which is a public website for any citizen to inspect and Ms. Williams was the only signer on the FSESC bank account. Further, Ms. Williams is listed as a governing board member and acting administrator on the PCS audit held in the county's public records. A copy of this document was provided to SBBC, PCS's governing board, and available on PCS's official school website for public viewing. This evidence proves that Ms. Williams' checks from PCS to FSESC bank account were legitimate payments that were not hidden from the governing board and was not done to execute any scheme or artifice.

Documentation was provided to PCS governing board, the public, and SBBC to disclose that Ms. Williams was an acting administrator at the school and that she contracted with her company as a vendor for PCS. Ms. Williams and FSESC are one in the same. Thus, there was no interstate communication in furtherance of the alleged scheme. The governing board of PCS exempted Ms.

Williams from the conflict of interest in accordance with F.S. § 112.313 (12) and authorized FSESC compensation by PCS.

PCS was already aware that Ms. Williams was a vendor as it was on file. The checks were not designed to lull the victim, PCS, into a false sense of security, or to postpone the complaint to authority because Ms. Williams contracting with her own company was disclosed.

The government must at minimum prove that the defendant contemplated some actual harm or injury to their victims." *United States v. Regent Office Supply,* 421. F. 2d 1174 (2nd Cir. 1970). Any misrepresentation was collateral and did not concern the quality or the nature of the services FSESC sold to PCS. It did not go to the bargain. At most, the evidence showed that Ms. Williams did not fully disclose to ACD, the landlord. Absent an intent to harm PCS, the evidence is insufficient to demonstrate fraudulent intent as required by the wire fraud statute. *Id.*

In *Kelly v. United States*, 140 S. Ct. 1565, 1573, (2020) the Court provides the distinction between foreseeable harms imposed on a victim as a "byproduct" of the defendant's actions, and harm that is purposefully inflicted on the victim, serves as the line between lawful and unlawful conduct. The personal loans from ACD are insufficient to implicate Section 1343.

The government made the mistake of confusing necessary versus sufficient conditions to meet the statutory requirements of wire fraud. Deceit indeed is a necessary condition within the wire fraud statute, however, deceit alone is not sufficient to meet the burden required to convict of a 1343 violation. The government alleged checks as "misrepresentations" amounting to the deceit yet failed to draw the linkage or present any evidence had the purpose of inducing the established victim to part with property or money to which it was entitled to and thereby bestowed authority. The government's flawed reasoning clearly lies within confusing causation with correlation. The checks were not the cause, used in furtherance of the scheme or to defraud "someone." The checks were actually in correlation to the legally binding contract which was established between PCS and FSESC for services rendered. The varying amounts of the checks were for different services performed for the operation of the school for students, including instructional support, school, administration, curriculum development and instructional services. Marcia Carty explained that they received the information for the checks via email or phone call. [DE: 143-34, 39, 42, 45, 47] Deceit alone is not a criminal offense. The falsity of any representations were not shown to be capable of affecting PCS's understanding of the bargain or influencing PCS's assessment of the value of the bargain, therefore the government failed to prove

injury flowed from the deception. *See United States v. Regent Office Supply Company*, 421 F.2d 1174, 1182 (2nd Cir. 1970) The checks were not false or fraudulent but were intended to compensate FSESC for Ms. Williams work. The checks were accurately reported to the accountant by Ms. Williams. PCS had a vendor that was exempt from a conflict of interest. Thus, Ms. Williams was eligible to do business with PCS. Luwando Wright acknowledged that this exemption exists under the law. [DE: 141-59-60]

The indictment only alleges the management company was "deceived." It does not allege that ACD was defrauded. Morley testified that they were <u>not</u> a management company for the school. He also testified that this was a mismanagement of funds/finances.

Wire fraud requires showing (1) that the Defendant knowingly devised or participated in a scheme to defraud; (2) that the Defendant did so willfully and with an intent to defraud; and (3) that the Defendant used interstate wires for the purpose of executing the scheme. *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312 (11th Cir. 2000).

In wire fraud cases involving property rights, "the Government must establish that the defendant intended to defraud a victim of money or property of some value." *United States v. Cooper*, 132 F.3d 1400, 1405 (11th Cir. 1998). State

and municipal licenses in general are not "property" for the purposes of this statute. *Cleveland v. United States*, 531 U.S. 12, 15, 121 S. Ct. 365, 369, 148 L. Ed. 2d 221 (2000) (addressing "property" for purposes of mail fraud statute). The mail fraud and wire fraud statutes are "given a similar construction and are subject to the same substantive analysis." *Belt v. United States*, 868 F.3d 1208, 1211 (11th Cir. 1989). *See also United States v. Svete*, 556 F.3d 1157, (11th Cir. 2009).

## II. <u>THERE WAS A MATERIAL VARIANCE AND/OR A CONSTRUCTIVE AMENDMENT IN VIOLATION OF THE 5TH AMENDMENT.</u>

The Fifth Amendment guarantees that a defendant can be convicted only of crimes that are charged in the indictment. A constructive amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment. A constructive amendment may occur in one of two ways: (1) by the prosecutor's actions; or (2) through the district court's instructions. *United States v. Altomare*, 673 F. App'x 956 (11th Cir. 2016) A properly preserved constructive amendment claim presents a constitutional claim that triggers de novo review. An unpreserved constructive amendment claim, however, is reviewed only for plain error. "This court is required to raise sua sponte the jurisdictional issue of whether

the indictment sufficiently alleges an offense in violation of the laws of the United States provided the mandate has not issued on direct appeal." *United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013)

In *United States v. Morse*, 785 F.2d 771, 775 (9th Cir.), cert. denied, 476 U.S. 1186, 106 S.Ct. 2925, 91 L.Ed.2d 553 (1986), the court identified three ways in which a variance between the indictment and the trial proof may be prejudicial. Those are: 1) inadequate opportunity to prepare a defense and exposure to unanticipated evidence at trial, citing to *Berger v. United States*, 295 295 U.S. 78, 83, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1935); 2) deprivation of the right to be tried only on charges presented in an indictment returned by a grand jury, citing to *Stirone v. United States*, 361 U.S. 212, 212-19, 80 S.Ct. 270, 273-74, 4 L.Ed. 2d 252 (1960); and 3) exposure to prejudicial evidentiary spillover, citing to *Kotteakos v. United States*, 328 U.S. 750, 774, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). Ms. Williams was deprived the right to be tried only on charges presented in an indictment by the grand jury when the court allowed the prosecution to present evidence of other acts and other parties that were not part of the Indictment. This occurred when the court allowed testimony that ACD was defrauded when ACD was not part of the Indictment. This was not presented to the grand jury. *See Stirone*. ACD, the landlord loaned monies to PCS and received rent

38

payments. ACD filed a civil action against Ms. Williams which they subsequently dismissed. ACD became the focal point of the Government's case and its closing argument. This was substantially prejudicial and deprived her of the right to be tried only on charges presented in the Indictment returned by a grand jury. She was denied an adequate opportunity to prepare a defense. ACD becoming a focal point resulted in unanticipated evidence at trial. *See Berger*.

When the evidence deviates from what is alleged in the indictment, either a constructive amendment or variance arises. *United States v. Flynt*, 15 F.3d 1002 (11th Cir. 1994). A constructive amendment of the indictment is per se reversible. *United States v. Keller*, 916 F.2d 628 (11th Cir. 1990); *United States v. Weissman*, 899 F.2d 1111, 1114 (11th Cir. 1990) A variance requires reversal only when it is established that the defendant's rights were substantially prejudiced. *Id. See United States v. Church*, 955 F.2d 688 (11th Cir. 1992).

In *United States v. Lander*, 668 F.3d 1289 (11th Cir. 2012), the court held that a prejudicial variance occurred in a mail fraud case of a county attorney. The indictment alleged that he defrauded the citizens of the county by accepting a bribe from developers and that the developers were falsely told that they had to pay him money as part of a "performance bond." At trial, the government proceeded on the theory that the defendant defrauded the developers by telling them that their

"payments" to him were for certain development costs that he would escrow or to "ensure" the project would obtain approval from the county officials. No developer testified that the defendant said the money was needed to pay for a performance bond. The Court ruled that this amounted to a material and prejudicial variance.

In *Howard v. Daggett*, 526 F. 2d 1388 (9th Cir. 1975), the court found a constructive amendment where the indictment charged the defendant with inducing two named women to engage in prostitution, but the evidence and the jury instructions allowed for the defendant to be convicted of inducing women that were not named in the indictment. In the Indictment, the victims were SBBC and DOE but at trial it was ACD.

Time and time again, the government insisted on ACD being a management company and has attempted to skirt this issue by claiming that it is common practice/policy to not identify the victims of the case. Yet, in the Indictment they specifically identify SBBC and PCS as victims. Mr. Morley testified that ACD was not a management company and that ACD had many titles including lender, landlord, and financier, but none of them were that of a management company. Likewise, the Government has cited to an email exchange between Mr. Morley and Ms. Williams in which Mr. Morley suggests to Ms. Williams that she, "consent to a business manager to handle the daily operations." That clearly proves that ACD

was in fact not a management company. ACD advised Ms. Williams to seek advice and employment of a manager. In closing arguments, the prosecution admitted to their mistake of not including and specifically naming ACD in the Indictment. This was an admission of a constructive amendment having occurred and must not have been allowed to be presented and argued to the jury.

An amendment of the indictment occurs when the charging terms of the indictment are altered either literally or in effect by prosecutor or court after the grand jury has last passed upon them. *United States v. Cancelliere*, 69 F.3d 1116, 1121 (11th Cir. 1995) A variance occurs when the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment. "A constructive amendment occurs when the essential elements of the offense as alleged in the indictment are altered to broaden the potential bases for conviction beyond what the indictment contains." *United States v. Tampas*, 493 F.3d 1291 (11th Cir. 2007) (citing *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004); *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990)); *see* also *United States v. Ward*, 486 F.3d 1212, 1227 (11th Cir. 2007).

The Government's case shifted gears, from the Indictment, to alleged bad acts by Ms. Williams against ACD. Although, Mr. Morley testified that none of the

funds provided by the company were ever deposited or "comingled" with any of the funds in the PCS Suntrust bank account.

Florida Statute 1002.33, states "The Governing Board of the school shall be responsible for judiciary, legal and regulatory compliance issues and the governing board holds complete oversight over the school." Further, in the charter agreement between the SBBC and PCS, it required in Section 14. D that, "This Charter shall not be assigned by either Party without the prior written consent of the other party, provided that the School may enter into contracts for services with an individual or group of individuals organized as a partnership or cooperative without the consent of the Sponsor." For ACD to be legally considered "part of the school," "inextricably intertwined," or its' funds to be, "comingled," within the governing board's PCS Suntrust bank account, ACD would have had to received "prior written consent of the other party." ACD/Morley never received consent to be assigned to the governing board's charter, which is the only way to make ACD "part of the school."

The Government was erroneously allowed to assert that ACD had been victimized here because Ms. Williams did not disclose all the governing board's business to ACD. The Court erred in allowing what was characterized as inextricably intertwined evidence and not 404(b). This was testimony/evidence

from ACD regarding alleged false statements in the loan application, of intent to defraud, and of a civil lawsuit to collect rent unpaid. This was used as proof of Ms. Williams bad character and her conduct being in conformity therewith.

In determining who is a "victim" of the defendant's fraud, (other than the victims included in the indictment), the court considers whether the purported victim "suffered a harm that directly and proximately resulted from the commission of the defendant's offense." United States v. Robertson, 493 F.3d 1322. 1334 (11th Cir. 2007); United States v. Martin, 803 F.3d 581, 593-94 (11th Cir. 2015).

In *Russell v. United States*, 369 US 749 769 (1962) the court pointed out that a consequence of amending the indictment is that the defendant "could then be convicted on the basis of facts not found by and perhaps not even presented to the grand jury which indicted him." "Thus, the Fifth Amendment forbids amendment of an indictment by the court whether actual or constructive." *United States v. Whacker*, 72 F.3d 1453 1474 (10th Cir. 1995)

III.    **THE DISTRICT COURT ERRED IN NOT GRANTING A NEW TRIAL BASED ON A BRADY VIOLATION.**

To prevail on a *Brady v. Maryland,* 373 U.S. 83 (1963) claim, the defendant must show that the evidence was exculpatory or impeaching, it should have been produced, and the suppressed evidence was material to his guilt or punishment. Evidence is material under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different had it been disclosed to the defense. *United States v. Bagley,* 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) and *Giglio v. United States,* 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). The prosecution's obligation to disclose evidence favorable to the defense turns on the cumulative effect of all such evidence suppressed by the government. *Kyles v Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) Moreover, this obligation is independent of whether at the time the prosecutor knew of the favorable evidence or appreciated its significance. The Government violated *Brady* by failing to disclose the May 24, 2017 letter from Jody Perry, the Director of Charter Schools Management/Support, for the SBBC, to Ewana Anderson, Governing Board Chair for AESC. [DE 149-1; Appendix] Ms. Perry, a Government witness, lists the **Subject: Financial and Governance Concerns: Paramount Charter School -5109** and, in multiple sections of said letter, it

44

confirms that Defendant and her sister had conducted business and received payment for goods and services rendered. This negates the argument that Ms. Williams performed no services and proves that the Government had knowledge of her bona fide wages for work in the ordinary course of business. It further negates that there was any form of intent to deceive and cheat. This confirms that SBBC had knowledge of her honest services with conflict-free exemption. This exculpated Ms. Williams of Counts 1-20. She was prejudiced because the suppressed letter showed that Ms. Williams' contract with PCS was disclosed to the SBBC, that she was not a volunteer, that a contract for her work did exist, and that she did work for which compensation was received. The May 24, 2017 letter demonstrates that SBBC was aware of Ms. Williams compensation from PCS.

This letter was exculpatory evidence and was not disclosed to Ms. Williams defense counsel who would have used it in his examination of Ms. Perry. Further, it would have been admitted as evidence for the defense of this case. The jury never had a chance to consider this exculpatory evidence. This supports the defense of disclosure of the conflict of interest and supports the claim of falling within the exemption. Also, it supports the argument that she must be cleared of all charges in accordance with *United States v. Jimenez,* 705 F. 3d 1305, 1310-11 (11th

Cir. 1305, 1310-11 (11th Cir. 2013) and *United States v. Takhalow,* 827 F.3d 1307, 1312-13 (11th Cir. 2016)

The suppression of this document proves that Ms. Williams's compensation was bona fide and in the usual course of business of a charter school, that Ms. Williams did not embezzle from PCS, and that PCS was not defrauded but "got what it bargained for." The payments listed in the letter, directly refer to the rendered services that match the 18 checks (Counts 3-20) that Ms. Williams was accused of doing "no services" for and FSESC not being a legitimate vendor. It proves that the checks to FSESC are not material misrepresentations because it was clearly disclosed and documented to SBBC for the work that Ms. Williams performed. Further, it shows FSESC was apart of the PEO and not an ESP which is why SBBC never sent PCS any notice that PCS was out of compliance with the charter contract alleging an ESP contract was not on file as required. PCS was not required to do so. *See* Wright's testimony. [DE: 141: 11-12, 17]

The Government's Fifth Response to the Standing Discovery Order [DE: 56, at 5] lists documents from E.A. (including emails), but nowhere is there any mention of emails from Jody Perry to Ewana Anderson. A letter from Anderson to Perry was received, but not the May 24, 2017 letter from Perry to Anderson which is the issue.

46

# IV. **THE DISTRICT COURT ERRED IN DENYING DEFENDANT'S JURY INSTRUCTIONS AND NOT ADDRESSING THE JURY CONFUSION.**

Ms. Williams was entitled to have the jury instructed, per Defendant's Proposed Jury Instructions [DE: 72, 81 & 86], as follows: (i)"Evidence of an undisclosed conflict of interest is insufficient, standing alone, to sustain a conviction for "intentionally misapplying "funds within the meaning of § 666."[DE: 136-16-18]; *See United States v. Jimenez*, 705 F.3d 1305-1310-11 (11th Cir. 2013); (ii) the Court to have included the following language at the end of element (3), "without authority from the Paramount School Charter School."[DE: 136-18-20]; (iii) the Court should have removed the following paragraph from the jury instructions, at page 8 under element (4) of Theft Concerning Programs Receiving Federal Funds 18 U.S.C. § 666(a)(1)(A): "In determining whether the Defendant is guilty of this offense, do not consider bona fide salary, wages, fees, or other compensation paid or reimbursed, in the usual course of business." [DE: 94-8; DE: 136-9-11]; (iv) the Court should have given the specific unanimity request of the Defendant to avoid juror confusion [DE: 136-24-25, 28-30]; and (v) the Court to have changed the language defining a "scheme to defraud" from "any plan to deceive *or* cheat to any plan to deceive *and* cheat … In *Shaw v. United States,* 137 S.Ct. 462, 469 (2016), involving a bank fraud statute, the jury instruction

defined "scheme to defraud" "as any deliberate plan of action or course of conduct by which someone intends to deceive cheat, or deprive a financial institution of something of value." In light of *Shaw,* the court in *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), casted serious doubt on the accuracy of this instruction on the ground that "the scheme must be one to deceive the bank and deprive it of something of value." In other words, a defendant must intend to deceive and cheat. *Id.* at 1101. The Court erred in not giving the jury instructions as requested.

Ms. Williams was entitled to have these instructions read to the jury as they were part of Defendant's "theory of defense for which there is [any] foundation in the evidence." *United States v. Ruiz*, 59 F. 3d 1151, 1154 (11th Cir. 1995). The burden of presenting evidence sufficient to support a jury instruction is "extremely low." *Id.* at 1154. Here, there was testimony that Ms. Williams did provide administrative services for PCS and vendor services by way of FSESC. [DE: 133-133-136; DE: 143-150-53, 169-70, 172-73] This was proof of a bona fide salary, wages, fees, or other compensation. This evidence, even if considered "extremely low" was indicative of an honestly held/formed opinion or belief even if the opinion or belief is mistaken. Her defense was that she performed many administrative services at the PCS for which she was entitled to compensation but for her being a member of the governing board. She was the owner of FSESC and

received funds for services performed. That this information was not disclosed to other members of the governing board does not constitute theft or fraud unless she intended to defraud PCS by receiving compensation that she was not entitled to. Also, Ms. Williams was qualified for the exemption of the conflict-of-interest clause (i.e., waived by the governing board). Thus, she was entitled to the compensation.

The 11th Circuit has a history of liberally allowing for requested jury instructions. "The defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Lively,* 803 F. 2d 1124, 1126 (11th Cir. 1986) (internal marks omitted). In reviewing the evidence, the court must view the evidence in the light most favorable to the accused. *See Ruiz*, 59 F 3d at 1154; *see United States v. Arias*, 431 F. 3d 1327, 1340-1342 (11th Cir. 2005), where the court vacated the conviction and remanded for a new trial for the court's failure to give the defense theory instruction.

In *United States v. Echeverry,* 719, F.2d 974, 975 (9th Cir. 1983), a case where the jury's written questions indicated their confusion concerning multiple conspiracies, the district court should have been alerted to the potential for a

nonunanimous verdict. Specific unanimity instructions are required where "there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *Id.* at 975 (quotation added). The trial court must augment the general instruction to ensure that that the jury understands its duty to unanimously agree to a particular set of facts. *Id.*

In *United States v. Anguiano*, 873 F.2d 1314, 1319-20 (9th Cir. 1989), they lay out situations where the court should give specific unanimity instructions where there is jury confusion. It cites *Echeverry* and states that specific unanimity instruction is required in cases, where the jury actually indicates, **by note to the court**, that it is confused about the nature of the crime charged. *Id.* at 1319. They stated that a general instruction of unanimity shall not be sufficient. *Id.* Here, the jury was in fact confused and informed the court, **by note**, of them not being unanimous.

The jury notes indicated that they were confused as to consider bona fide wages, and saying that their group had a problem and had issues with agreeing on terminology. They continued to say that they were going in circles about the case and how they were very frustrated with that and about missing work because of this. Likewise, they said how they are wasting the Judge's and their own time.

They then went on to ask if they must agree that Ms. Williams is guilty or innocent on all counts and if they disagreed on some counts does that make them a hung jury. The court either did not answer or the answers were not helpful as they made another note asking what determines a hung jury and if they could meet with the judge for clarification which went unanswered. Shortly after these notes, they returned a verdict. [DE: 92:5] [DE: 92:3] [DE: 93:1] [DE: 92:4] [DE: 92:2] [DE: 93:5] [DE: 92:2] [DE: 93:4] [DE: 92:1]

As illustrated above, the jury was confused and very frustrated with the Court's explanations and the jury instructions. They did not understand the jury instruction at page 8 which Defendant had asked the Court to remove, simplify the wording, and to be placed in another section. The language was vague and confusing. Likewise, the jury was not told that they were not to determine Ms. Williams innocence but whether she was guilty or not guilty. Finally, the Jury Notes regarding having problems on certain terminology, going in circles, people getting frustrated, having missed 9 days of work, and wanting to address the court face to face for a clarification/definition of a hung jury were not specifically addressed by the Court. The confusion was disregarded, and the court did not provide clarity nor provide specific instructions. The fact that the jury convicted in a short period of time thereafter when the court did not address their concerns is

evident of a compromise to go home and to avoid further absences from work. Likewise, the Jury Verdict form had several asterisks and marks on various counts when the instruction was to check the yes or no box which is indicative of the confusion, ambiguity, and disagreement on some or all of the counts. What we have here is jurors concluding that Defendant may have committed different acts and were not allowed to consider the administrative services provided by Ms. Williams which was the crux of her honest belief and good faith defense. The jury was clearly still speculative when it reached its verdict and was thereafter polled, and only succumbed to a verdict out of pure frustration and lack of instruction which is why a new trial must be granted.

Appellant was entitled to the specific unanimity instruction, the bona fide wages instruction, and clarification as to who the victims were. There lacked a sufficient instruction that made it plain that ACD was not to be considered when evaluating who had been defrauded or deceived. There was a need for an instruction that considered the bona fide wages so that the jury could decide if Ms. Williams had a legitimate belief that the money was her honest compensation. Ms. Williams did in fact do administrative/vendor work for PCS without hiring anyone to do the same tasks that she performed. This honest belief that the money was hers and that she earned it, would ultimately negate any supposed intent to defraud or

any scheme that Ms. Williams allegedly orchestrated. The instructions improperly guided the jury in such a way as to violate Appellant's due process by failing to instruct and clarify her "bona fide" salary under the law and the requirement to unanimously agree to a particular set of facts. There was no guidance from the Court.

Erroneous instruction will entitle a defendant to a new trial "only when a reasonable likelihood exists that the jury applied the instruction in an improper manner." *United States v Leonard*, 138 F.3d 906, 910 (11th Cir. 1998) In our case, the above-described instructions clearly ensured that there was a reasonable likelihood the jury would apply the instructions in an improper manner. "An instruction will give rise to error only where 'the Court finds that the issues of law were presented inaccurately, the charge included crimes not contained in the indictment, or the charge improperly guided the jury in such a substantial way as to violate due process.'" *United States v. Arias*, 984 F.2d 1139 (11th Cir 1993)(citing *United States v. Turner*, 871 F.2d 1574, 1578 (11th Cir. 1989)).

## V. __THE DEFENDANT WAS SUBSTANTIALLY PREJUDICED BY PROSECUTORIAL MISCONDUCT.__

The court erred in not granting a mistrial when in closing the Government, on multiple occasions, used name calling. Such as, calling Ms. Williams a wolf dressed in sheep clothing and like a vampire who wants to keep their victim alive. [DE: 135-17, 22-23] This was harmful error and highly prejudicial.

When they referred to Ms. Williams as a vampire the Court sustained the objection by defense counsel. The Court said that there is no room for that type of conduct, and it was improper for this Court. The Court said that there should be no name calling. [DE: 135-22-23] The jury had already heard this name calling towards Appellant, which would have swayed their view on her and when considering that she had previously been referred to as a wolf with sheep clothing, which was not addressed or stricken by the Court. The jury had had already listened to these comments/name calling which improperly influenced them in their verdict. This was intentional to make the jury believe that Ms. Williams was an evil person/villain. This was a culmination of what had begun during cross examination of Ms. Williams when the prosecution made indistinct noises, that were transcribed as "Mm-hmm," as Ms. Williams was answering questions. The Court had to warn the prosecutor not do this any further or her cross examination would terminate. [DE: 143-203-204]. These incidents by the prosecutor

compounded the situation against Ms. Williams. It proves the defense's point that there was an abundance of prejudice that impacted the outcome of the case.

"In evaluating whether improper statements by a prosecutor at trial merit reversing a conviction some of the factors considered by the court are: (1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish guilt of the accused." *See Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994); *Unites States v. Wilson*, 149 F.3d 1298 (11th Cir. 1998)

These improprieties and sustainment of one objection did not remove the prejudice. Even curative instructions do not cure such error: "A jury cannot always be trusted to follow instructions to disregard improper statements." *See United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987) (repeated efforts by the prosecutor to discredit defense counsel with disparaging remarks was prejudicial error not cured by efforts by the court to rectify the error with instruction to disregard the comments).

In *United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999), the prosecutor committed numerous closing argument "offenses" including telling the jury that an uncalled witness would have corroborated another witness on an important point.

The prosecutor also referred to the defendant as a 'monster' and 'wicked and vicious.' The conviction was reversed."

The Government went too far when it called Ms. Williams a "vampire" and a "wolf dressed in sheep clothing." The prosecutor "may not make an argument directed to passions or prejudices of the jurors." *United States v. Bailey*, 123 F.3 1381 (11th Cir.1997). These statements were intended to inflame the passions of the jury.

## VI.    THE DISTRICT COURT ERRED IN ORDERING RESTITUTION.

Restitution was not appropriate in this case because the SBBC and DOE were not victims. They no longer had a property interest in the funds as per the testimonies adduced at trial and spelled out above. *See McNally v. United States*, 483 U.S. 350, 360 (1989). Once the funds were turned over to PCS they were no longer in the hands of the SBBC or DOE which destroyed their proprietary interest. [DE: 188, 191-24-27, 193]

"Restitution amount imposed on defendant in full amount paid by government, following convictions relating to operation of day care centers that received government funding, was proper where entire day care business was permeated by fraud, and defendant failed to meet burden to show he provided

legitimate services under 18 U.S.C.S. § 3664(e). *United States v. Karie*, 976 F.3d 800, 2020 U.S. App. LEXIS 31046 (8th Cir. 2020), reh'g denied en banc 2020 U.S. App. LEXIS 38089 (8th Cir. Dec. 7, 2020). In contrast, Appellant provided legitimate services to the school as illustrated above and it was not permeated by fraud. The restitution order was not appropriate because PCS was not victimized. Appellant performed the honest services and was disclosed as a vendor.

"Imposition of restitution…for funds obtained for fraudulent operation of charter school, was upheld where defendants failed to point to any legitimate use of funds at restitution hearing. *United States v. Pierce*, 479 F.3d 546, 99 A.F.T.R.2d (RIA) 2007-1350, 2007 U.S. App. LEXIS 5437 (8th Cir. 2007). Unlike *Pierce*, Appellant has shown countless times the legitimate use of funds to run the school.

## CONCLUSION

This Court must reverse Appellant's convictions with instructions to dismiss the Indictment. Alternatively, the Court should remand for a new trial.

## CERTIFICATE REGARDING TYPE, SIZE AND STYLE
## AND COMPLIANCE WITH WORD COUNT LIMITATIONS

Appellant, JIMIKA IVORY WILLIAMS, certifies that this Initial Brief of Appellant is typed in 14 point, Times New Roman. Further, pursuant to Federal Rules of Appellate Procedure 28 and 32, and Eleventh Circuit Rule 28-1 and 28-2, this Initial Brief of Appellant contains 12,891 words.

BY: s/Manuel Gonzalez, Jr._____

MANUEL GONZALEZ, JR., ESQ.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 6th day of March, 2023, I electronically filed the foregoing document/Initial Brief of Appellant with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF, and by U.S. Mail to Jimika Ivory Williams, Reg. No. 19888-509, FPC Alderson, Federal Prison Camp, Glen Ray RD. BOX A, Alderson, W.V. 24910. I further certify that on March 6, 2023 an electronic brief was provided by uploading the foregoing brief to the court's internet website at

www.ca11.uscourts.gov.

Respectfully submitted,

MANUEL GONZALEZ, JR., ESQ.
Florida Bar No. 397997
Attorney for Appellant
121 Alhambra Plaza
Suite 1500
Coral Gables, Florida 33134
(305) 444-1400
(305) 938-5009 (FAX)
Mannylaw7@yahoo.com (email)

BY: s/Manuel Gonzalez, Jr._____
MANUEL GONZALEZ, JR., ESQ.